UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JASON BECKNER,<br>JODI BECKNER, | )<br>)<br>) | |
| Plaintiffs, | )<br>) | |
| v. | )<br>) | No. 1:21-cv-01395-SEB-TAB |
| MAXIM CRANE WORKS, L.P., | )<br>) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendant's Motion for Summary Judgment [Dkt. 66] filed on January 13, 2023, pursuant to Federal Rule of Civil Procedure 56. Plaintiffs Jason Beckner ("Mr. Beckner") and Jodi Beckner ("Ms. Beckner") (collectively "Beckners") have brought this lawsuit against Defendant Maxim Crane Works, L.P. ("Maxim"), alleging that Maxim caused Mr. Beckner permanent injury through negligent operation of a crane at a worksite where Mr. Beckner was employed. Ms. Beckner has alleged a separate loss of consortium claim against Maxim based on Mr. Beckner's injuries.

For the reasons detailed below, we <u>GRANT</u> Defendant's Motion for Summary Judgment.

**Factual Background**

**I.     General Background**

On November 11, 2019, Mr. Beckner was injured while performing work for his employer, Commercial Air, Inc. ("Commercial Air"), a business primarily engaged in

HVAC work. Beckner Dep. 52:23–53:23; T. Gatewood Dep. at 6:5–7:2. Mr. Beckner worked as an Operator for Commercial Air, and his typical on the job duties included digging holes with an excavator. *Id.* On the day of Mr. Beckner's accident, a crew comprised nearly entirely of Commercial Air employees was engaged in constructing a home for the then-owner of Commercial Air, Tim Gatewood ("Tim"). Flores Dep. 7:8–8:4; 38:20–39:1.

Prior to the accident, Mr. Beckner had never worked at a jobsite with Commercial Air where he or any of his co-workers set roof trusses on a commercial building or a residential home.  When he arrived on the jobsite on the date of the accident, Mr. Beckner was "surprised" to learn that he would be setting trusses "[b]ecause that's usually not in our scope of work."  Beckner Dep. at 59, 60.  Mr. Beckner had no experience with framing a home and had never received training in setting roof trusses, nor did he receive any safety training or equipment (other than a hard hat), review any safety documents regarding the installation of trusses, or receive any explanation as to how to properly brace a truss.  *Id.* at 22–23, 57–58, 59.

The only non-Commercial Air employee on site the day of the accident was Emmitt Pugh, a crane operator employed by Maxim. *Id.* at 38:20–39:1; Pugh Aff. at ¶ 2–3. Maxim's business includes providing crane services and crane operators to construction sites. Def.'s Answers to Interrogs. at ¶ 6.

## II.    November 11, 2019 Jobsite

Prior to November 11, 2019, Chris Gatewood ("Chris"), then-Vice President of Commercial Air and son of then-owner Tim, contacted Maxim to hire a crane for the

2

project on November 11, 2019. C. Gatewood Dep. at 16:13–23. Upon being so engaged, Maxim issued a dispatch ticket to Mr. Pugh limited to detailing the arrival and finishing times of the assigned work, the location of the jobsite, and crane load details (among other information) about the job. Pugh Dep. at 59:24–60:17.

On November 11, 2019, after Mr. Pugh had arrived at Maxim's facility, he was given the dispatch ticket, retrieved the appropriate crane, and drove to the home construction site. arriving at 8:00 a.m.; the other workers had arrived at 7:00 a.m. Pugh Dep. at 21:12–22:15. Bowman Dep. at 14:1–2; T. Gatewood Dep. at 17:10–15. Upon his arrival, Mr. Pugh checked in with Tim, who signed a Short Term Service Agreement ("Service Agreement") with Maxim. Dkt. 76-11; Pugh Dep. 56:8–18. Mr. Pugh inquired of Tim as to where he suggested he set up the crane and thereafter surveyed the ground conditions. Pugh Dep. 24:2-8.

The Service Agreement executed by Tim contained the following provision:

> THE TERMS AND CONDITIONS GOVERNING THIS AGREEMENT AS DESCRIBED ON THE FRONT AND BACK SIDES ARE UNDERSTOOD, AGREED TO AND ARE INCORPORATED BY REFERENCE.  CUSTOMER IS PLACED ON NOTICE THAT THE TERMS AND CONDITIONS ON THE REVERSE SIDE CONTAIN PROVISIONS THAT, AMONG OTHER THINGS, REQUIRE CUSTOMER TO INDEMNIFY OTHERS, INCLUDING MAXIM, FROM CUSTOMER'S AND OTHER PARTIES' NEGLIGENCE; WAIVE ALL JURY TRIALS; AND LIMITS WARRANTIES.

*Id.* Further, the Terms and Conditions incorporated into the Service Agreement included the following term:

> **1. Control, Supervision and Operation of Equipment, Operators and/or Crew:** Customer agrees that Equipment and all persons operating or maintaining such Equipment including Maxim's employees, agents or independent contractors, **are under Customer's exclusive jurisdiction, possession, supervision, and control,** Customer is responsible for providing a competent and experienced site supervisor and lift director to oversee job site and lifting operations. . . . Customer is responsible for providing overall job safety. . . . Customer assumes responsibility, control of, and supervision for rigging, hooking and unhooking loads. Customer agrees to provide

competent and qualified signal person to direct **Maxim's** equipment operators. . . . Customer is responsible to ensure the Equipment shall be operated in a safe and lawful manner at all times. . . . If Equipment is furnished with an operator, the services of such operator will be performed under the complete direction and control of Customer and operator shall be considered Customer's employee for all purposes other than the payment of wages, worker's compensation, and their benefits.

[Dkt. 68-7 at 2].

Mr. Pugh's sole function at the job site was to operate the crane to raise trusses to the roofline of the house then under construction. Pugh Aff. at ¶ 5–6. By maneuvering the crane, Mr. Pugh picked up the trusses vertically allowing Commercial Air employees to manage the "tag lines" to guide the trusses into place on the roof. T. Gatewood Dep. at 16:10–18. Mr. Pugh used the crane to pick up only the trusses identified by Tim and other Commercial Air employees, which he lifted according to the directions given by Commercial Air employees, moving them to the place as he was instructed by Commercial Air employees. Pugh Aff. ¶ 5. Mr. Beckner was among the Commercial Air employees located on the roof whose job it was to reset the trusses after they had been raised by Mr. Pugh. Beckner Dep. at 52:9–53:22.

The operator's manual for Maxim's crane sets out the following instructions to the operator: (1) "As operator of this crane, you are granted the authority to stop and refuse to lift loads until safety is assured," (dkt. 76-6 at 17); (2) "[y]ou are the only one who can be relied upon to assure the safety of yourself and those around you. Be a professional and follow the rules of safety," (*id.* at 16); and (3) "[a]void lowering or swinging the boom and load into ground personnel, equipment, or other objects," (*id.* at 35).

Mr. Pugh believed that Tim, as the supervisor of the project, had the authority (and responsibility) to terminate his work at the job site if and when it became unsafe or unsatisfactory work. *Id.* at ¶ 6. Mr. Pugh also understood that, as the crane operator, while he had the authority to stop a lift if he believed continuing it would be unsafe, he did not believe he had the authority to bring the job to a halt generally. Pugh Dep. at 36:9–13.

Around lunchtime on the day of the accident, Chris visited the site and became concerned about the safety of the worksite. C. Gatewood Dep. at 10:14–16; 34:13–17. Chris told Tim to stop the work, ensure the trusses were properly braced, and complete this job the next day. *Id.* at 59:19–24. Concerns also arose among other Commercial Air employees with regard to the speed at which Mr. Pugh was conducting the lifts. T. Gatewood Dep. at 22:3–18. Commercial Air employees, including Tim, told Mr. Pugh to slow down, which he would do for a while, but that more measured pace lasted only for the ensuing two or three lifts before Mr. Pugh returned to his prior, more accelerated speed. *Id.*

At approximately 1:30 p.m., Tim determined that the work on the site was complete after the final truss had been set in place. T. Gatewood Dep. at 19:20–22. Tim then signaled to Mr. Pugh that the day's work was complete and that he could begin breaking down the crane. Pugh Dep. at 58:14–20; 63:22–63:5.

## III.   Mr. Beckner's Injury

During the process of Mr. Pugh's breaking down the crane, Commercial Air employees noticed one or two wind gusts passing through the worksite. Flores Dep. at 62:16–20; Young Aff. at ¶ 9; Chriswell Aff. at ¶ 9. Following these wind gusts, some of

5

the previously installed trusses collapsed, one or more of which struck Mr. Beckner, leaving him injured. Young Aff at ¶ 9–10; Beckner Dep. at 52:9-53-22; Pugh Dep. at 66:5–11; Chriswell Aff. at ¶ 11. Following Mr. Beckner's injury, Michael Chriswell, a Commercial Air employee, instructed Mr. Pugh to reconstruct the crane so it could be used to lift the trusses off Mr. Beckner. Chriswell Aff. at ¶ 12. To do so, Mr. Pugh followed the directions given by Commercial Air employees, lifting the trusses to allow Mr. Beckner to be dragged out from underneath the pile. Pugh Dep. at 67:17–24. Thereafter, Mr. Pugh was instructed to break down the crane a second time and vacate the area to allow the fire department to enter the space. *Id.* at 67:25–68:6.

Prior to the collapse of the trusses, Commercial Air employees noted the absence of any bracing to stabilize them. Chris testified that when he arrived he had observed the amount of bracing was "real close to not any." C. Gatewood Dep. 57:4–12. This was a matter of concern to Chris, which he voiced to Tim. *Id.* at 58:14–17; 59:25–60:9. Tim testified that he, too, had noticed that the trusses lacked diagonal bracing. T. Gatewood Dep. 24:4–10. Before the collapse, Chris had observed how wind gusts had caused the trusses to sway. C. Gatewood Dep. 58:3–13. Mr. Beckner stated that he, too, had noticed the trusses were wobbly and lacked bracing. Beckner Dep. 73:16–74:12. An Indiana Department of Labor, Occupational Safety and Health Administration report on this incident confirmed that "[w]ooden truss assemblies were not secured from collapse when they were not diagonally braced." Dkt. 68-12 at 6. A report prepared by Benjamin D. Hosinski, P.E., concluded that it was the lack of proper bracing trusses that caused the

trusses' collapse. Dkt. 68-13 at 3. Mr. Hosinski explained that the lack of diagonal bracing compromised the trusses' ability to withstand wind. *Id.* at 3, 6.

While Mr. Pugh was raising the trusses, some of them bumped into other trusses that had already been set in place. Pugh Dep. at 37:3–10. Tim testified that the bumping of the trusses was "pretty hard" and that it was more a "smack" than a bump. T. Gatewood Dep. at 21:7–13. Tim estimated that fifteen or more trusses had been bumped in that way by other trusses. *Id.* at 22:19–21.

**IV.   The Instant Lawsuit**

On April 23, 2021, Plaintiffs initiated this lawsuit in Boone Superior Court, which case Maxim removed to our court on diversity jurisdictional grounds on May 27, 2021. Dkt. 1 at 1. On June 17, 2022, Maxim moved to dismiss for lack of subject matter jurisdiction, arguing that because the Indiana Worker's Compensation Act provides the exclusive remedy for Mr. Beckner's injuries, our court lacked subject matter jurisdiction over Plaintiffs' claims. On January 13, 2023, before we had ruled on Maxim's motion to dismiss, Maxim moved for summary judgment, raising the worker's compensation exclusivity defense as well as merits-based arguments in support of judgment in its favor.

On March 14, 2023, we denied Maxim's motion to dismiss, holding that, although an Indiana Worker's Compensation Act exclusivity defense is properly advanced under *Indiana law* through a motion for lack of subject matter jurisdiction under Indiana Trial Rule 12(B)(1), under *federal law*, this worker's compensation defense does not affect the court's subject matter jurisdiction based on diversity of citizenship.  Dkt. 78 at 2 (citing *Goetzke v. Ferro Corp.*, 280 F.3d 766, 778–79 (7th Cir. 2002); *GKN Co. v. Magness*, 744

7

N.E.2d 397, 400 (Ind. 2001)). Because Maxim had brought its motion to dismiss solely under Rule 12(b)(1) for lack of subject matter jurisdiction and we "clearly have subject matter jurisdiction over this litigation based on diversity of citizenship pursuant to 28 U.S.C. § 1332," we denied Maxim's motion. *Id.* However, we made clear that our ruling did "not preclude Maxim from raising the issue of exclusivity under the Worker's Compensation Act in the proper procedural context, including at summary judgment." *Id.* at 3 n.1. Now before the Court is Maxim's motion for summary judgment, which is fully briefed and ripe for ruling.

## Legal Analysis

### I.    Summary Judgment Standard

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

### II.    Discussion

Maxim has moved for summary judgment, arguing that Plaintiffs' claims are barred by worker's compensation exclusivity provision, and even if not barred, that they fail on

the merits because Maxim owed no duty to Mr. Beckner and the uncontroverted evidence offered by Maxim establishes that the cause of the collapse of the trusses resulted from Commercial Air employees' own failure to properly install, brace, and secure the trusses from collapse, and was not the result of any allegedly negligent actions or inactions by Mr. Pugh.  Because we find, for the reasons detailed below, that worker's compensation is the exclusive remedy for the Beckners' injuries, we address only that argument.

### A. Indiana Worker's Compensation Act Exclusivity

The Worker's Compensation Act "provides the exclusive remedy for recovery of personal injuries arising out of and in the court of employment." *Argabright v. R.H. Marlin, Inc.*, 804 N.E.2d 1161, 1165 (Ind. Ct. App. 2004) (citing Ind. Code § 22-3-2-6), *trans denied*.  "Although the Worker's Compensation Act bars a court from hearing any common law claim brought against an employer for an on-the-job injury, it does permit an action for injury against a third-party tortfeasor provided the third-party is neither the plaintiff's employer nor a fellow employee." *Johnson v. Poindexter Transp., Inc. and Crane Serv.*, 994 N.E.2d 1206, 1211 (Ind. Ct. App. 2013).

"A person may have more than one employer at any given time for purposes of the Worker's Compensation Act when one employer has loaned his employee to another employer." *Verma v. D.T. Carpentry, LLC*, 805 N.E.2d 430, 433 (Ind. Ct. App. 2004). Thus, "[w]here two employers 'so associate themselves together that both are in direct control of the employee and he is made accountable to both, he will be considered an employee of both employers ….'" *GKN Co. v. Magness*, 744 N.E.2d 397, 402 (Ind. 2001) (quoting *U.S. Metalsource Corp. v. Simpson*, 649 N.E.2d 682, 685 (Ind. Ct. App.

9

1995)).  In federal court, "employment status under Indiana law goes to the merits of the claim and is a mixed issue of law and fact appropriate for submission to a jury if the facts are in dispute."  *Ebea v. Black & Decker (U.S.), Inc.*, No. 1:07-cv-1146-DFH-TAB, 2008 WL 1932196, at *2 (S.D. Ind. May 1, 2008) (citation omitted).

Here, Maxim seeks summary judgment on the grounds that Mr. Pugh was dually employed by Maxim and Commercial Air at the time Mr. Beckner was injured, and thus that Mr. Beckner was a co-employee of Mr. Pugh such that the Worker's Compensation Act bars the Beckners' claims against Maxim.  The Beckners, on the other hand, claim that Mr. Beckner was not a co-employee of Mr. Pugh's at the time of the accident, and they are therefore entitled to sue Maxim for Mr. Pugh's alleged negligence.

In determining whether an employer-employee relationship exists in a dual-employment situation such as that presented here, Indiana courts apply a seven-factor balancing test originally set forth by the Indiana Supreme Court in *Hale v. Kemp*, 579 N.E.2d 63 (Ind. 1991).[1]  The *Hale* factors include the following: (1) the right to

---

[1] Plaintiffs argue that to determine whether Mr. Pugh was an employee of Commercial Air at the time of incident for purposes of the Worker's Compensation Act, we should apply the ten-factor test applied by the Indiana Supreme Court in *Moberly v. Day*, 757 N.E.2d 1007 (Ind. 2001), rather than the seven-factor *Hale* test.  However, in *Moberly*, the Supreme Court clarified that the ten-factor test is applied "when the issue is employee versus independent contractor status" while the *Hale* test is used when the question is, as it is here, "whether a person was an employee of two different employers."  *Id.* at 1010 n.3.  Because *Moberly* makes clear that "each list of factors works slightly better when applied only for the purpose for which it was developed," *id.*, we apply the seven-factor *Hale* test in the case at bar.  Plaintiffs have put forth arguments only under the *Moberly* test and have not addressed the *Hale* factors.  Thus, to the extent those factors overlap, we will consider Plaintiffs' arguments as set forth in their opposition to Defendant's motion to dismiss and renewed in response to Defendant's summary judgment motion.  However, by failing to address the *Hale* factors that differ from the *Moberly* test, Plaintiffs have waived any arguments they might have put forth as to those factors.

discharge; (2) mode of payment; (3) supplying tools or equipment; (4) belief of the parties in the existence of an employer-employee relationship; (5) control over the means used in the results reached; (6) length of employment; and (7) establishment of the work boundaries. *Id.* at 67. These factors are "weighed against each other as part of a balancing test as opposed to a mathematical formula where the majority wins." *Johnson*, 994 N.E.2d at 1212 (citing *GKN*, 744 N.E.2d at 402). Although no single factor alone is dispositive, in performing the balancing, "the greatest weight should be given to the right of the employer to exercise control over the employee." *Id.* (citing *Argabright*, 804 N.E.2d at 1166). We address each of these factors in turn below.

## B. The *Hale* Factors

### 1. Right to Discharge

The first factor, to wit, the right to discharge, is undisputed: Commercial Air had no power to terminate Mr. Pugh from his employment at Maxim. However, under Indiana law, "the right to discharge factor can be established where the special employer [Commercial Air] did not have the power to terminate the borrowed employee's employment with the general employer [Maxim], but could terminate the borrowed employee's employment with the special employer." *Johnson*, 994 N.E.2d at 1212 (collecting cases).

Here, Maxim posits that Commercial Air could have terminated Mr. Pugh from the Construction Site project if it had chosen to do so. Mr. Pugh likewise has averred that he understood that the job foreman or the owner of the project could at any point discharge him from working at the Construction Site project if Commercial Air was

dissatisfied with his work or believed that he was operating the crane in an unsafe or otherwise unsatisfactory manner.  Pugh. Aff. ¶ 6.  Commercial Air does not maintain otherwise.  This conclusion jibes with common sense, since a finding that Commercial Air had no right to discharge, "[t]aken to its logical extreme, … would mean that [the crane operator] could not be removed even if he were operating the crane in a patently unsafe manner." *Verma*, 805 N.E.2d at 434.

Because Maxim has established that Commercial Air had a right to discharge Mr. Pugh from its employ, this factor weighs in favor of a finding that Mr. Pugh was a borrowed employee of Commercial Air.  *See, e.g.*, *id.* (finding that the right of discharge factor weighed in favor of dual employment because, although the special employer did not have the authority to terminate the employee's employment with the general employer, the special employer did have the authority to terminate the employee's employment with the special employer); *Argabright*, 804 N.E.2d at 1166 (same).  This factor is generally afforded little weight, however, given that the right of an entity to indirectly discharge is fairly "universal." *Ebea*, 606 F. Supp. 2d at 924.

### 2.  Mode of Payment

We next address the mode of payment factor.  There is no dispute that Commercial Air paid Maxim for the work performed by Mr. Pugh, and Maxim, in turn, paid Mr. Pugh for the time he worked at the Construction Site.  Commercial Air's job foreman, Mike Chriswell, verified Mr. Pugh's hours, and Commercial Air paid Maxim for additional time to account for Mr. Pugh being directed by Mr. Chriswell to reset the crane after it had been broken it down thereby allowing Mr. Pugh to use the crane to

assist in lifting the collapsed trusses off Mr. Beckner.  Although Commercial Air indirectly paid for Mr. Pugh's services, Maxim was solely responsible for the direct payment of Mr. Pugh's wages, taxes, withholdings, benefits, and worker's compensation coverage.  Under circumstances similar to those presented here, Indiana courts have found that the mode of payment factor weighed against a finding of employment.  *See GKN*, 744 N.E.2d at 405 (concluding that this factor weighed against dual employment where, though the special employer signed the employee's timecards, the direct employer issued the paychecks, withheld taxes, paid employee's worker's compensation insurance premiums, and provided him with health insurance); *Wishard Mem. Hosp. v. Kerr*, 846 N.E.2d 1083, 1089 (Ind. Ct. App. 2006) (concluding that this factor weighed against a finding of dual employment where, though special employer signed the employee's time cards and paid the direct employer for the employee's services, the direct employer paid the employee after withholding taxes).  However, as with the "right to discharge" factor, Indiana courts have found that the "mode of payment" factor is generally "entitled to little weight in helping determine" whether a dual employment relationship existed.  *Id.*

### 3.  Supplying Tools or Equipment

The next factor, to wit, supplying tools or equipment, weighs in favor of a dual employment relationship "when most of the equipment used by the employee was supplied by the special employer."  *Johnson*, 994 N.E.2d at 1213.  Here, Maxim provided the crane, which was operated by Mr. Pugh.  Although Tim Gatewood from Commercial Air was the certified rigger on the project, the rigging that was used was also supplied by Maxim.  Accordingly, because Maxim supplied the equipment used to move and secure

13

the trusses, this factor weighs against a conclusion that Mr. Pugh was a borrowed

employee of Commercial Air.

### 4.   Belief in the Existence of an Employer-Employee Relationship

In determining the belief of the parties regarding the existence of an employer-

employee relationship, there is no direct testimony regarding Commercial Air's and Mr.

Pugh's subjective beliefs as to whether they had an employer-employee relationship, but

the fact that Mr. Pugh worked for Commercial Air for only a single day would typically

"lead[] to the inference that [they] would not have believed such a relationship existed."

*Verma*, 805 N.E.2d at 434.   Here, however, prior to Mr. Pugh's beginning work on the

day of Mr. Beckner's accident, Mr. Gatewood signed Maxim's Short Term Service

Agreement,[2] which explicitly provided that Commercial Air agreed that Maxim's crane

operator "shall be considered [Commercial Air's] employee for all purposes other than

the payment of wages, workers' compensation, and their benefits."   Dkt. 40-1.   The

evidence does not disclose whether Mr. Pugh actually knew the terms of the Short Term

Service Agreement or otherwise believed himself to be a borrowed employee, but to the

extent that Tim Gatewood can be assumed to have read and understood those terms prior

---

[2] In response to Defendant's motion to dismiss on grounds of worker's compensation exclusivity,
Plaintiffs urged the Court not to consider the Short Term Service Agreement because it has not
been properly authenticated.  However, in response to Plaintiffs' objection, Maxim adduced
testimony from Tim Gatewood's son, who now owns Commercial Air following his father's
retirement, that he is familiar with his father's handwriting and that the signature on the Short
Term Service Agreement is in fact his father's.  Maxim's records custodian and Operations
Manager, Anthony Marlin, also testified that the Short Term Service Agreement is a record kept
in the normal course of business and that the creation of the record is a regularly conducted
activity as a regular practice of Maxim. This evidence is "sufficient to support a finding that the
item is what the proponent claims it is," which is all that is required for authentication.  Fed. R.
Evid. 901(a).

to signing the contract, the Short Term Service Agreement provides at least some evidence in support of the conclusion that Commercial Air and Maxim believed an employer-employee relationship existed between the crane operator and Commercial Air. Given that Indiana courts recognize that "the belief of the parties in the existence of an employer-employee relationship can often best be determined by the terms of the contract," *Wishard*, 846 N.E.2d at 1090 (internal quotation marks and citation omitted), we find that this factor weighs slightly in favor of a finding of an employment relationship between Mr. Pugh and Commercial Air.

### 5.  Control Over the Means Used in the Results Reached

Regarding the control factor, as noted above, while "not dispositive, control is the most important factor when determining whether an employer-employee relationship exists." *Argabright*, 804 N.E.2d at 1167 (quotation marks and citation omitted).  In analyzing this factor, Indiana courts consider the terms of any contract that governs the parties' relationship.  *See, e.g.*, *GKN*, 744 N.E.2d at 406 (finding control factor did not support an employment relationship in part because the parties' contract specified that the alleged employer was "not in charge" of the "means and methods" of the alleged employee's work). In the specific context of a crane operator and crane lessee, Indiana courts have previously "found sufficient control to demonstrate an employment relationship when the employees of a crane lessee directed the crane operator and determined which loads he lifted and how he lifted them, despite the fact the crane operator retained the right to refuse to perform a task if he deemed said task to be unsafe." *Johnson*, 994 N.E.2d at 1213 (citing *Argabright*, 804 N.E.2d at 1167).

15

Here, Mr. Pugh has testified that, although he retained the authority to stop a particular lift if he believed the conditions were unsafe, he was not authorized to stop the job entirely.  The evidence further establishes that, when Mr. Pugh arrived at the Construction Site, he consulted with Tim Gatewood and followed his directions as to where to set up the crane.  Once the crane lifts began, Mr. Pugh was at all times directed by Commercial Air employees as to which trusses to lift, when he was supposed to lift them, and where they were to be placed.  Specifically, during installation of the roof trusses, either Tim Gatewood or one of his Commercial Air employees performed the rigging process for the trusses and connected the trusses to the crane with straps, after which Mr. Pugh raised the trusses at the Commercial Air signaler's direction.  Once the trusses reached the roofline, Commercial Air employees "grabb[ed] ahold of the tag lines" and "direct[ed] them in."  Dkt. 68-6 at 16:17–18.

Additionally, the Short Term Agreement entered into by Commercial Air and Maxim provides in relevant part that "[i]f Equipment is furnished with an operator, the services of such operator will be performed under the complete direction and control of Customer [Commercial Air] and operator shall be considered Customer's employee for all purposes other than the payment of wages, worker's compensation, and their benefits." Dkt. 68-7 at 2.  These facts thus all strongly weigh in favor of a finding that Commercial Air controlled Mr. Pugh's activities on the jobsite on the day of Mr. Beckner's injury.

Our conclusion that the control factor weighs in favor of a finding of dual employment is not affected by Tim Gatewood's testimony that, although Commercial Air employees instructed Mr. Pugh on several occasions to slow down and to stop banging

16

trusses into one another as he put them in place, each time Mr. Pugh followed those instructions for only a short period before resuming his previous pace and practice of banging the trusses together. Although Mr. Pugh denies that this occurred, we view the facts in the light most favorable to Plaintiffs on summary judgment, thus assuming that Mr. Pugh did not follow to the letter Commercial Air's instructions regarding the speed and care with which he was operating the crane. Even so, the fact that Commercial Air employees were directing Mr. Pugh to slow down and perform his work in a certain manner demonstrates that he was in fact operating under their direction and control. That Commercial Air employees may have had to repeatedly remind Mr. Pugh to perform the job in the manner they specified reinforces the conclusion that his movements were being directed by Commercial Air. For these reasons, we find that the control factor, properly analyzed, estblishes that Mr. Pugh was a borrowed employee of Commercial Air.

### 6. Length of Employment

As to the length of the employment, this factor weighs against a finding of dual employment. Under Indiana law, the "longer the length of employment, the more indicative it is of an employer/employee relationship." *GKN*, 744 N.E.2d at 406. Here, Mr. Pugh worked at the Construction Site for only one day. Accordingly, this factor rebounds against a conclusion that an employee-employer relationship existed.

### 7. Work Boundaries

Lastly, the evidence adduced by Maxim establishes that on the day at issue Commercial Air set the boundaries within which Mr. Pugh worked at the Construction Site. It is undisputed that Tim Gatewood instructed Mr. Pugh as to the location where he

17

should set up the crane and that all of Mr. Pugh's work was performed within the physical boundaries of the Construction Site.  In addition, Commercial Air employees directed Mr. Pugh regarding which trusses to lift, when to lift them, and where to place them. Commercial Air employees also provided temporal boundaries to Mr. Pugh, instructing him as to when the job was completed and where he should tear down the crane and when to reconstruct the crane in order to lift the fallen roof trusses off Mr. Beckner. Plaintiffs have put forth no argument or evidence otherwise.  This factor therefore weighs in favor of a finding of dual employment.

### 8.  Balancing the *Hale* Factors

As discussed above, in determining whether an employer-employee relationship exists, the relevant factors "must be weighed against each other as part of a balancing test as opposed to a mathematical formula where the majority wins." *GKN*, 744 N.E.2d at 402.  Here, the mode of payment, supplying tools and equipment, and length of employment factors weigh against a finding that Mr. Pugh was Commercial Air's employee at the time of Mr. Beckner's accident, given that Mr. Pugh was paid directly by Maxim not Commercial Air, Maxim provided the crane and the rigging for the project, and Mr. Pugh worked at the Construction Site for only one day.

However, all of the remaining factors—the right to discharge, the parties' belief in the employment relationship, work boundaries, and finally the issue of control, which is the factor allocated the most weight in this calculus—weigh in favor of finding of a dual employment relationship.  Further, it is undisputed that Commercial Air had an indirect right to discharge Mr. Pugh; the contract between Commercial Air and Maxim clearly

stated that Mr. Pugh was an employee of Commercial Air for all purposes other than payment of wages, worker's compensation, and benefits and that Mr. Pugh would perform his crane operation services under the "complete direction and control" of Commercial Air; and that Commercial Air employees in fact did direct Mr. Pugh where to place the crane, which roof trusses to lift and when, where to place each roof truss, and when the job was complete. Balancing the *Hale* factors and giving considerable weight to control as we are required to do, we hold, that a dual employment relationship existed here between Mr. Pugh, the crane operator, and the injured plaintiff's employer, Commercial Air, and that Mr. Pugh was a borrowed employee of Commercial Air at the time of Mr. Beckner's accident. This conclusion is in line with at least five Indiana Court of Appeals cases involving very similar facts. *See Johnson v. Poindexter Transport, Inc.*, 994 N.E.2d 1206 (Ind. Ct. App. 2013); *Verma v. D.T. Carpentry, LLC*, 805 N.E.2d 430 (Ind. Ct. App. 2004); *Argabright v. R.H. Marlin, Inc.*, 804 N.E.2d 1161 (Ind. Ct. App. 2004); *Nowicki v. Cannon Steel Erection Co.*, 711 N.E.2d 536 (Ind. Ct. App. 1999); *Davis v. Central Rent-A-Crane*, 663 N.E.2d 1177 (Ind. Ct. App. 1996).

Accordingly, because at the time of his injury Mr. Beckner was Mr. Pugh's co-employee, Mr. Beckner's exclusive remedy for the injuries he incurred is under Indiana's Worker's Compensation Act, and he is barred from bringing any other claim for damages against Maxim. Mrs. Beckner's loss of consortium claim against Maxim likewise fails because Indiana law is clear that "being derivative in nature, a spouse's loss of consortium claim cannot proceed when the injured spouse's negligence claim against the same party is barred by the exclusivity provision of the Worker's Compensation Statute." *Wine-*

19

*Settergren v. Lamey*, 716 N.E.2d 381, 390 (Ind. 1999) (citations omitted).  Maxim is

therefore entitled to summary judgment on all claims in this case.

## III.     Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment [Dkt. 66] is

<u>GRANTED</u>.  Final judgment shall be entered accordingly.

IT IS SO ORDERED.


Date:  _____9/7/2023_____          _Sarah Evans Barker_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Elliott Joseph Hostetter
ehostetter@rolfeshenry.com

R. Eric Sanders
ROLFES HENRY CO., LPA
esanders@rolfeshenry.com

Christopher G. Stevenson
WILSON KEHOE & WININGHAM
cstevenson@wkw.com